Filed 12/22/14  In re Angel T. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re ANGEL T., et al., a Person Coming Under the Juvenile Court Law. | |
| | D066082 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. CJ1133) |
| v. | |
| ANITA B., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Laura J. Birkmeyer, Judge.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel and Dana C. Shoffner, Deputy County Counsel, for Plaintiff and Respondent.

Anita B. (Mother) appeals an order wherein the juvenile court: (1) found that returning three children to the Mother would create a substantial risk of detriment; and (2) denied the Mother's request for unsupervised visitation. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A. Historical Background

The Mother has three children: Angel born in March 1998, Angelica born in May 2000, and Angelie born in November 2002. On July 2, 2013, the San Diego County Health and Human Services Agency (Agency) filed a petition on behalf of 15-year-old Angel. The petition alleged the Mother hit Angel in his head and face on numerous occasions, causing bruising, and also that the Mother choked him. In addition, the petition included allegations that Angel had autism and the Mother failed or refused to provide required mental health treatment.

The Mother took Angel to the emergency room on June 28, 2013. She informed hospital staff he had autism, was violent earlier in the day, and she punched him in the face in self-defense. Angel had a hematoma on his forehead, bruises around his eye orbitals, swelling to his face, and scratches on his chest and neck. Medical staff directed the Mother to remain at the hospital with Angel, but she did not.

Angel stated on June 28, 2013, the Mother told him to go play outside, but he did not want to because it was too hot. He claimed the Mother became upset and punched him in the face three times with her fists. She threatened to " 'beat him up' " if he called the police. Angel denied hitting his mother. He said he put his arms up to block her punches. He also contended the Mother pushed his head into a wall twice and she had

2

smoked marijuana earlier in the day because her wrist was injured. Angel asserted that the Mother's boyfriend slapped him three times across the forehead. Angel commented that the Mother did not hit his sisters, but the Mother called him " 'evil.' "

Angel was treated at the hospital and released. Police transported him to Polinsky Children's Center (PCC).

The Mother informed the social worker that neighborhood children gave Angel a BB gun and he was shot several times in the stomach earlier in the week because it did not work properly. On June 28, 2013, Angel wanted to go outside to play with the BB gun but she would not allow him to do so. She claimed Angel became upset and fought her and she had a seizure and hit Angel in defense of herself and her other children. She stated she was tired of fighting with Angel so she left him at the hospital. She feared for her life and her daughters' safety and insisted she could not care for Angel any longer. The Mother showed the social worker bruises to her arm and scratches to her chest and hand.

During the course of the investigation, Angelie disclosed Angel rubbed her private area on June 28, 2013, after he fought with the Mother. She did not tell the Mother because she was afraid the Mother would have a seizure. The social worker and Mother created a safety plan.

At the time of the June 28, 2013 incident, the Agency already had an investigation open on this family due to an earlier child welfare referral.[1]  On June 3, 2013, the Agency received a referral indicating the Mother and Angel had a physical confrontation that left him with marks and scratches.  The Mother stated Angel became violent when she asked him to do his chores and claimed he assaulted her.  Angel asserted the Mother beat him because he would not do his chores.  The social worker created a safety plan in which the Mother was not to hit Angel, but instead, she would call the police if he was confrontational.  The Mother declined a team decisionmaking meeting (TDM) and the social worker learned Angel's case with the San Diego Regional Center (Regional Center) had closed and the Mother was not willing to reopen it.

On July 1, 2013, the Mother stated she could no longer take care of Angel.  She stated he attacked her and his sisters and that he had threatened to harm her with knives and other weapons.  Angel's sisters denied abuse by the Mother and did not witness the Mother strike Angel.

On July 3, 2013, the Agency received another child welfare referral indicating the Mother suffered from strokes and epilepsy and was admitted to the hospital three weeks earlier.  According to the referral, the Mother was hospitalized again on July 1, 2013, and a blood test revealed the presence of both marijuana and methamphetamine.  The Mother

---

[1]     In addition, there were numerous child welfare referrals on this family indicating a prior history of domestic violence, the Mother having medical issues, Angel being diagnosed with autism and experiencing difficult behaviors, and Angelie also experiencing mental health problems.  Further, law enforcement responded to disturbances at the family home on three occasions.

informed the social worker that now that Angel was no longer in her care and " 'that the problem is gone,' " she will not get as many seizures or strokes.

The Mother admitted she bought marijuana on the street on June 28, 2013, after she left Angel at the hospital, while she was on her way to pick up her daughters, because she was stressed and felt like she would have a seizure. She believed it was laced with methamphetamine. The social worker discussed drug treatment with the Mother, but she became irate and yelled she had a medical marijuana card because of her wrist. She admitted to using methamphetamine three to four years ago. She refused to attend drug treatment. The Mother passed out while the social worker was interviewing her.

On July 3, 2013, the social worker spoke with the children and checked on their welfare. They had no marks or bruises and denied any knowledge of the Mother using drugs.

At the detention hearing held on July 5, 2013, the juvenile court found a prima facie showing was made on the petition and it detained Angel in out-of-home care. The Agency's counsel informed the court it was evaluating whether Angel's sisters required the protection of the juvenile court as well.

On July 8, 2013, the Agency filed petitions on behalf of 13-year-old Angelica and 10-year-old Angelie. The petitions alleged the Mother used methamphetamine and marijuana and had a history of narcotic use. At the detention hearing, the juvenile court found a prima facie showing was made on the petitions and it detained the girls with the Mother.

For the July 25, 2013 jurisdiction and disposition hearing, the Agency recommended Angel remain in out-of-home care and the girls be placed with the Mother. Angel was aware the Mother and her boyfriend used marijuana in the family home and could smell it at times and observed them behave differently after using it. The Mother had not visited or called Angel during his 24-day stay at PCC.

The Agency conducted a TDM in this case during which the Mother admitted to hitting Angel. She stated she was tired of him beating up on her and she wanted to concentrate on her health and her daughters. She was willing to re-enroll in Regional Center services for Angel and Angelie. She admitted to having no training in working with children with autism. She wanted Angel returned to her home after he received services. Near to this time, Angelie also was diagnosed with autism.[2]

However, the Mother refused to answer questions about her background. The social worker interviewed the Mother's medical insurance case manager who informed her that the Mother refused to take her seizure medication. Moreover, the social worker obtained medical records documenting nine different visits to the emergency room and/or hospital by the Mother from January to July, 2013. On each visit, the Mother requested narcotic pain medication. On July 7, 2013, she tested positive for benzodiazepines, marijuana metabolite, and opiates. On July 1, 2013, she tested positive for

---

[2]    This diagnosis was later determined not to be accurate. In Angelie's 2013 individualized education program (IEP), her qualifying disability was speech and language impairment.

6

amphetamines, benzodiazepines, and marijuana metabolite.  On March 9, 2013, she tested positive for marijuana metabolite and opiates.

The Mother set the case for trial.  Angelica and Angelie's counsel set the case for trial as to the family maintenance recommendation.  The court advised the Mother she needed to provide accurate information to the juvenile court and be respectful to the court.  It ordered the Mother to enroll Angel and Angelie in Regional Center services within two weeks and directed the Agency to confirm the Mother enrolled the girls in school.  It further ordered the Mother be drug tested at least every other week until the next hearing and granted the Agency authority to remove the girls if the Mother had another positive test.

By the time of the settlement conference on August 5, 2013, Angel had been moved to a foster home.  The Mother still had not enrolled Angel or Angelie in Regional Center services and provided conflicting information regarding the girl's enrollment in school.  The case was confirmed for trial.

The social worker visited the Mother in her home later in the day on August 5, 2013, after the settlement conference. The Mother explained she continued to use marijuana daily via cookies and brownies containing the substance.  She accepted referrals for services, except for drug treatment.  In addition, she tested positive for marijuana metabolite.

On August 13, 2013, the Mother provided the social worker with completed intake packets for the Regional Center.  On August 14, 2013, the social worker observed what appeared to be a marijuana plant at the Mother's home.   The social worker also obtained

7

records which revealed the Mother had not been taking the children to their medication management appointments on a regular basis.

The court held a contested jurisdiction and disposition hearing on August 16, 2013. After considering all the evidence and testimony, it made true findings on all the petitions and declared all the children dependents. The court removed Angel from the Mother and placed him in licensed foster care. It modified the Mother's case plan to have her address domestic violence with individual therapy and otherwise approved of the Mother's case plan, which required her to abstain from illegal drugs, comply with all drug tests, interact with the children without physical abuse or harm, demonstrate an understanding of age appropriate behavior of the children (taking into account their developmental delays), demonstrate her ability to protect the children from sexual abuse, attend counseling with a TERM therapist, take responsibility for abusive behavior and write a letter of apology, participate in and complete a child abuse class, complete an in-home parenting program, be assessed for substance abuse and comply with treatment recommendations, and attend 12-step meetings. As to the girls, the court ordered them removed from the Mother's care, as was requested by minors' counsel, and it detained them in licensed foster care, pending further hearing.

For the continued disposition hearing on August 29, 2013, the Agency reported the Mother had another positive drug test for marijuana metabolite on August 19, 2013, though the levels were lower than the previous test on August 5, 2013. She was assessed for substance abuse treatment and enrolled in the Don Allen ParentCare Family Recovery Center (ParentCare) drug treatment program and the social worker provided her with

8

therapy referrals. The court ordered an Interstate Compact on the Placement of Children (ICPC) for placement in Arizona with the maternal grandparents. It further ordered the Mother to have reduced levels of marijuana in her system and provided parameters for any future unsupervised visits. It placed the girls in licensed foster care.

On October 17, 2013, the juvenile court authorized maternal relatives to have supervised visitation with the children. It also granted the Agency permission to detain Angelica separately from Angelie, as the foster mother reported Angelica was assaultive to Angelie and may require a higher level of care.

### B. The Reunification Period

For the six-month review hearing on February 6, 2014, the Agency recommended the children remain in out-of-home care and the Mother continue to receive reunification services. Further, the Agency requested discretion to place the children with the maternal grandparents in Arizona if their current placements could not be maintained. The children were placed in three separate foster homes. During the reporting period, the Agency received a number of child welfare referrals concerning alleged abuse or neglect of the children both in their foster homes and by the Mother. None of the referrals were substantiated. Further, Angelica and Angelie experienced several placements due both to their behaviors and the Mother harassing caregivers.

Angel qualified for services from the Regional Center due to his diagnoses of autism and developmental delays. He attended therapy and had his medication managed by a psychiatrist. Angelica received intensive in-home therapy due to her difficult behaviors. Angelie had mild developmental delays and did not qualify for Regional

9

Center services, though she received services at her school pursuant to her IEP. She also saw a psychiatrist and her foster parent wanted a referral to a new therapist as the prior provider was too far away.

The court appointed special advocate (CASA) for Angelie and Angelica observed the Mother seemed more focused on her own needs than on the children. In addition, although the Mother visited the children frequently, the visits seemed to cause more harm than good and the children were stressed out after the contact, taking several days to calm down. The girls expressed to their CASA that during the visits, the Mother questioned them and coached them as to what to say and not to say to others.

Angel's CASA reported Angel became more agitated and unsure about his future after visits with the Mother. He recommended a set visitation schedule for the Mother and that she continue to receive reunification services.

The Mother attended therapy, but her therapist left the organization and the Mother was to receive a new therapist. In addition, she was participating in parenting education classes. The Mother was referred by a substance abuse specialist to the ParentCare treatment program. She tested positive for THC and methamphetamine on September 3 and 11, 2013. She was discharged for noncompliance, failure to obtain medical clearance for her medications, and refusing to drug test. The Mother informed her drug treatment counselor she needed medical marijuana for her seizures, but she failed to provide proof her doctor prescribed marijuana and did not provide the program with her medical provider's information.

The Mother then reported she intended to enroll in the House of Metamorphosis program, but that it would not accept her due to her seizures. On December 30, 2013, the social worker confirmed the Mother enrolled in the KIVA drug treatment program. The program was willing to work with the Mother if she provided them with all of her doctors' contact information and a 30-day supply of nonnarcotic prescription medication for her seizures and heart conditions. However, she was discharged the next day.

The Mother had a visit with the children scheduled for December 31, 2013. Prior to the visit, she acted anxious and claimed her arm hurt. She wanted to take Tramadol, a medication not permitted at KIVA. During the visit with the children, KIVA staff noted the Mother used her arm actively. She brushed one of the girls' hair and wiped off a table. After the visit, the Mother went upstairs and when she returned, she claimed she had a seizure. No one observed the seizure and when paramedics responded, the Mother's vital signs were normal. However, she was still admitted to the hospital and given Percocet. The Mother failed to inform the hospital she was in drug treatment. The Mother decided not to return to KIVA. She never provided the program with a 30-day supply of her medication as originally agreed. Program staff observed she was not willing to work with the program and was not a good fit. The staff referred the Mother to McAllister East County Regional Recovery Center.

On January 17, 2014, the Mother attended an educational group at the East County Regional Recovery Center. However, she refused to participate in a group session, which was required for admission. Further, she wanted the program to provide her with housing and when told they did not offer such a service, she decided not to participate. Yet, the

11

Mother informed the social worker she left the East County Regional Recovery Center because of her seizures.

The Mother attended 12-step and Narcotics Anonymous (NA) meetings at the Southeast Alano Club. Staff reported she attended multiple meetings per day and was very determined. She had supervised visitation with the children on Tuesdays and often arranged additional visits with the foster parents. In addition, the maternal grandmother in Arizona had supervised contact with the children and wanted to be considered for placement, but the Mother was adamantly opposed. The ICPC with the maternal grandparents was approved. The children reported they loved their grandparents and wanted to be placed with them if they did not reunify with the Mother.

On the day of the February 6, 2014 six-month review hearing, the Mother informed the social worker she was living in a sober living home. She also stated she was enrolled in an outpatient program at the Family Recovery Center. The social worker agreed to send her a new list of therapy referrals because the Mother relocated to north San Diego County. The Mother then enrolled in the Serenity House program in Escondido on February 6, 2014.

At the hearing on February 6, 2014, the Mother set the case for trial.

On March 3, 2014, the Mother reported that she moved to a sober living home in San Diego. On March 6, 2014, the Mother was admitted into the Harmony West outpatient treatment program in San Diego. She continued to attend NA meetings. All of the Mother's drug tests since the February 6, 2014 court date were negative, including a

hair follicle test requested by her counsel. In addition, the Mother and Agency worked to obtain a new therapist for the Mother.

### C. The Contested Six-Month Review Hearing

Trial commenced on May 7, 2014. At trial, the court received into evidence several Agency and CASA reports containing the information provided in the "Historical Background" and "Reunification Period" sections above. In addition, the juvenile court heard the testimony of social workers Ashley Harden and Judy Wonders. Harden and Wonders testified consistent with the various Agency reports.

Among other topics, Harden testified about the Mother submitting to drug testing when she enrolled in a new substance abuse program. She also testified about the Mother submitting to a hair follicle drug test.[3] Harden stated that the Mother had not complied with the substance abuse treatment component of her case plan during the review period. She also noted that the children looked forward to visits with the Mother, and the visits reflected many positive aspects, allowing the Mother to demonstrate her parental role and knowledge of the children's development.

Wonders echoed some of Harden's concerns about the Mother's failure to complete any substance abuse program. However, Wonders noted that the Mother attended NA meetings regularly and was almost finished with her parenting class.

---

[3]    There was additional evidence admitted that the Mother was aware of the hair follicle drug test, and as such, the test was not random.

The court received into evidence the stipulated testimony of Angel's foster father. The testimony indicated that Angel was happy to see his mother during her visits and she texted him daily.

The court also received into evidence a declaration from the Mother's sponsor, hospital records, drug testing documents, NA meeting sign offs, a letter from the Mother's health care case manager, and letters of support from the Mother's religious leaders.

After carefully considering the evidence, the juvenile court found by clear and convincing evidence that returning the children to the Mother would create a substantial risk of detriment. It determined she was not able to meet the children's needs. The court recounted the history of the case, including the "constellation of issues," the Mother's physical abuse of Angel, her failure to meet his medical and other needs with respect to his autism, her substance abuse, including both illegal and prescription drugs, and her psychological and pain issues.

The court found the Mother made some progress on her case plan. It noted she demonstrated attendance at NA meetings and maintained a relationship with her sponsor. She also had good communication with Angel's foster parent.

However, the court also noted the Mother had neglected certain portions of her case plan, particularly her failure to comply with drug treatment and testing, which it considered to be a critical issue. The court rejected the Mother's position she could not find a good treatment program because of her medical issues. It believed the social worker, who noted that it would be more difficult, but not impossible, to find an

14

appropriate program for the Mother, given her other issues. The court also observed that evidence showed some of the Mother's treatment providers were willing to work with her if she adhered to certain parameters, which she did not do. The court commented on issues with the Mother's honesty and not providing complete information to providers.

The court gave little weight to the hair follicle drug test because there was inadequate foundation provided. And, it noted that test as well as the Mother's drug tests that were performed when she decided to enroll in various drug treatment programs were not random.

With regard to therapy, the court concluded the Mother was beginning to make progress when, through no fault of her own, her provider became unavailable to her. However, thereafter the delay in re-enrolling in therapy was largely due to the Mother's frequent moves and changing circumstances.

The court also noted the interruption in the Mother's visits had to do with her seeking medical care and failing to communicate that to the visitation center. It found the Mother received reasonable services in this case. The court ordered the Agency to drug test the Mother twice per month if she elected not to participate in a treatment program.

The Mother timely appealed.

DISCUSSION

I

*THE COURT'S DETERMINATION THAT PLACING THE CHILDREN WITH THE MOTHER WOULD CREATE A SUBSTANTIAL RISK OF DETRIMENT*

The Mother claims substantial evidence does not support the juvenile court's determination that return of the children to her custody would create a substantial risk of detriment. To this end, she contends she was actively engaging in a majority of her case plan components and there was no evidence that she was currently abusing drugs. Although there exists evidence to support the Mother's position, the Mother fails to explain why substantial evidence does not support the court's determination.

The Mother raises a substantial evidence challenge to the juvenile court's order. In reviewing such a challenge, we evaluate the evidence in the light most favorable to the trial court's determinations, resolve all evidentiary conflicts in favor of the prevailing party, and indulge in all reasonable inferences to uphold the trial court's findings. (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053.) We do not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts. (*In re S.C.* (2006) 138 Cal.App.4th 396, 415.) The burden is on the party or parties challenging the findings and orders of the trial court to show there is no evidence of a substantial nature to support the finding or order. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

Application of the "substantial evidence" test to the Mother's case requires us to review the whole record in a light most favorable to the juvenile court's order and presume the existence of every fact the trier of fact could have reasonably deduced from

16

the evidence in support of its decision. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) Our focus is on the whole record of evidence presented before the juvenile court and not just on " 'isolated bits of evidence.' " (*People v. Johnson* (1980) 26 Cal.3d 557, 577.)

The juvenile court provided a very thorough explanation to support its findings in this matter. The court noted that the children were originally removed from the Mother's custody for a "constellation of issues." These issues included her physical abuse of Angel, her failure to meet Angel's medical and other needs (such as obtaining the necessary requisite services for Angel's autism), her abuse of both illegal and prescription drugs, her hospital and doctor shopping to obtain prescription pills, and growing marijuana in her home. Because of the multitude of issues, the court observed that she had been "given a very comprehensive case plan." The juvenile court explained, "And with respect to [the Mother's] progress, in terms of her case plan, I do not find that she has made substantive progress with the provisions of the case plan. I do find she's made some progress." We are satisfied that substantial evidence supports the court's findings.

Because the Mother had a substance abuse problem, an important aspect of her case plan was meeting with a substance abuse specialist who would assist the Mother in enrolling in substance abuse programs. The Mother was unable to complete any substance abuse program and her participation in any such program was inconsistent. For example, the Mother lasted little more than a month in ParentCare's substance abuse program, during which, she tested positive for THC and methamphetamines. Although instructed to do so, the Mother never provided ParentCare with proof that her doctor prescribed medical marijuana as treatment for her seizures.

17

The Mother did not participate in any substance abuse program during October or November 2013. In December 2013, she tried to enroll in the House of Metamorphosis substance abuse program, but was not accepted.

The Mother also lasted only a day in her substance abuse program at KIVA. In January 2014, the Mother had an appointment at the McAllister East County Regional Recovery Center. The Mother, however, refused to participate in a group session which was required for admission. When informed the program did not provide housing, the Mother stated she did not want to participate. The Mother stated she left the program because of her seizures and was going to attempt admission to yet another program.

From February through April 2014, the Mother attended multiple substance abuse programs, but was not able to complete any one program. Overall, the evidence showed she moved from program to program, failed to comply with requirements, did not engage in substantive treatment to address her addictions, and did not make progress in this significant element of her case plan. And, although the Mother may have had medical issues, which perhaps complicated her participation in treatment, the evidence demonstrated several programs were willing to work with her. The juvenile court noted that it was more difficult for the Mother to participate in a substance abuse program because of the medication she was taking, but found that it was not "impossible" for her to find and comply with a program. The court further observed that various programs were willing to work with the Mother. The evidence supports the court's observation.

The evidence also shows the Mother struggled to progress with the individual therapy component of her case plan. Although the Mother was attending therapy with a

18

therapist, her therapist became unavailable in early January 2014 through no fault of the Mother. The Mother was provided with the names of additional therapists. The Mother, nevertheless, informed the social worker she preferred a therapist in north San Diego County and the social worker promptly mailed her a list of approved therapists. After receiving the list and selecting a new therapist, the Mother decided that she wanted a therapist in San Diego. Although the Mother finally arranged for therapy to continue, she decided to attend therapy at a drug treatment program. But that therapist was not on the TERM team, so the Mother worked with the social worker to find another therapist, eventually finding a therapist and allegedly resuming therapy on March 31, 2014. The record does not reveal if she actually commenced therapy that day. But, even if she did, the evidence demonstrated the Mother did not attend therapy from at least early January 2014 through the end of March 2014.

Additionally, the juvenile court was very concerned about the Mother's drug testing. The court noted the Mother's drug tests were not random. And the court gave very little weight to the hair follicle drug test. The court also observed that the Mother tested positive for marijuana on January 7, 2014 despite her assurance that she was no longer using marijuana. Substantial evidence supports the court's findings regarding the Mother's drug testing.

In her opening and reply briefs, the Mother fails to address any of the evidence supporting the court's finding that the Mother did not make substantive progress with certain provisions of the case plan. Instead, the Mother stresses that she attended NA meetings and was close to completing her parenting education classes. To this end, the

19

Mother simply is asking us to reweigh the evidence. We will not do so. (See *In re S.C.*, *supra*, 138 Cal.App.4th at p. 415.) Here, the evidence strongly suggests the Mother selected what she was willing to comply with in her case plan. She did not engage in a substantial portion of her services that would have challenged her addiction, improper behaviors, and poor judgment. She chose what portions of the case plan she would follow and made excuses about her failure to comply with the rest. Accordingly, we conclude substantial evidence supports the juvenile court's finding that the Mother failed to comply with significant portions of her case plan, and thus, return of the children to her custody raised the possibility of a risk of detriment to the children.

II

*THE COURT'S DETERMINATION THAT VISITATION*
*SHOULD REMAIN SUPERVISED*

The Mother also contends that there was insufficient evidence that a substantial danger to the children's well-being would exist if visitation with the Mother was unsupervised. As a threshold matter, we note that we do not apply a substantial evidence review to a juvenile court's decision to maintain visitations unchanged. Here, the court did not deny all visitation, but instead, exercised its discretion to maintain the same level of supervised visitation. (See *In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356.)

A court defines the rights of the parents to visitation by balancing the interests of the parents in visitation with the best interests of the child. (*In re Jennifer G.* (1990) 221 Cal.App.3d 752, 757.) During the reunification period, visitation must be as frequent as possible, "consistent with the well-being of the child." (§ 362.1, subd. (a)(1)(A); see

20

*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1426; *In re Alvin R.* (2003) 108 Cal.App.4th 962, 972.) The court may limit a parent's contact with a child upon finding that such limitation is in the child's best interest. (*In re Cheryl H.* (1984) 153 Cal.App.3d 1098, 1133.)

Here, we note that court did not deny the Mother visitation with her children altogether or limit existing visitation. Instead, the juvenile court elected not to allow unsupervised visitation. The court explained that it wished to see a "greater period" "of sobriety" before it allowed unsupervised visitation. In light of the Mother's history of substance abuse, her inability to participate in a substance abuse program, and her failure to submit to random drug testing during the review period, the juvenile court soundly exercised its discretion. There is nothing in the record that leads us to believe that the court's decision was arbitrary, capricious, or patently absurd. (See *In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

DISPOSITION

The order is affirmed.

HUFFMAN, J.

WE CONCUR:

McCONNELL, P. J.

HALLER, J.

21